**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>　　　　Plaintiff,<br><br>　　v.<br><br>**TEDDY ASEFA, et al.,**<br>　　　　Defendant. | **CASE NO.  2:22-CR-222(3)**<br><br>**JUDGE EDMUND A. SARGUS, JR.** |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum for the sentencing of Teddy Asefa.  As explained below, the United States recommends a sentence of 240 months which is the top of the range of the agreed upon in the plea agreement, followed by five years of supervised release with conditions of release to be determined by the Court, and a $200 mandatory special assessment.  This case is set for sentencing on September 11, 2025.

**I.　　Background**

The defendant and his co-conspirators were targets of a years-long investigation by law enforcement regarding their drug dealing and their roles in a violent street gang called the Third World Mob.  The investigation demonstrated that the gang operated since at least 2013, and up through at least 2022.  As part of the gang's operations, the defendant and his co-conspirators trafficked marijuana.

For the purposes of the initial charges, the investigation culminated in the defendant and his co-conspirators Kflegewerges Abate and Menelik Solomon being found on November 1, 2022, with more than 1,500 pounds of marijuana and multiple firearms at a residence in the Columbus area.  The defendant was eventually indicted for the above-described conduct.  On December 6,

2023, the defendant was charged by way of second superseding indictment with conspiring to distribute controlled substances, in violation of 21 U.S.C. § 846 [Count 1]; possessing a firearm in furtherance of a drug trafficking crime (in Count 1), in violation of 18 U.S.C. § 924(c)(1)(A)(i) [Count 2]; possession with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vii) [Count 3]; possessing a firearm in furtherance of a drug trafficking crime (in Count 3), in violation of 18 U.S.C. § 924(c)(1)(A)(i) [Count 4], felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) [Count 5]; obstruction of justice, in violation of 28 U.S.C. §1512(c)(2) [Count 7]; and wire fraud, in violation of 18 U.S.C. § 1343 [Count 9]. Trial was to commence on August 7, 2024, but the defendant pled guilty to Counts 1 and 9 on August 1, 2024. Three of his coconspirators went to trial. Over the course of the trial, the government presented a case directed toward the remaining coconspirators. However, the evidence also demonstrated that the defendant is a 3WM drug dealer. He has admitted this by way of his guilty plea and acknowledgement to the statement of facts.

**Guidelines/Presentence Report**

Probation issued a final Presentence Report (PSR) on June 10, 2025, which recommended:

- A base offense level of 34 given the amount of narcotics (U.S.S.G. § 2D1.1(a)(5) and (c)(3));
- A 2-point enhancement for the possession of a firearm (U.S.S.G. § 2D1.1(b)(1));
- A 2-point enhancement for the use of violence (U.S.S.G. § 2D1.1(b)(2));
- A 2-point enhancement for maintaining a premises (U.S.S.G. § 2D1.1(b)(12);
- A 2-point enhancement for committing the offense as a pattern of criminal conduct (U.S.S.G. § 2D1.1(b)(16)(E); and
- A 4-point enhancement for role in the offense (U.S.S.G. § 3B1.1(a).

After grouping and factoring in acceptance of responsibility, the result was a total offense level of 43; with a criminal history of V, the resulting range is life.

This case carries with it a mandatory term of imprisonment of 10 years.

The parties entered into a binding plea agreement with an agreed sentencing disposition of a range of not less than 144 months and not more than 240 months. (Doc. #: 228).

Objections remain outstanding.

### A. The Defendant's Objections Have No Merit

The defendant brings twenty objections. None has merit.

#### 1. Objection to the quantity of marijuana

The defendant first objects to the base offense level (BOL) being scored as a 34. He is incorrect. The PSR correctly calculated the BOL based on the evidence before the Probation Office. Here, the facts before the Probation Office demonstrated that Asefa was part of the Third World Mob; that Asefa dealt drugs as one of the leaders of the Third World Mob; and that the Third World Mob dealt—*at a minimum*—500 pounds, or approximately 223 kilograms, of marijuana a month from at least January of 2015 through the end of October 2022.[1] By the PSR's calculation, this leads to an aggregate amount of almost 22,000 kilograms of marijuana for the sake of scoring the defendant's BOL. And according to the Guidelines, that many kilograms of marijuana lead to a BOL of 34.

The defendant counters this by arguing that 1,000 kilograms of marijuana should be a BOL of 30. That would be true if that's how many kilograms of marijuana were at issue. But that's not how many were at issue. That's how many kilograms, *at a minimum*, the government had to prove as part of the conspiracy to achieve a conviction for Count 1. That is a separate issue from how much marijuana to include in the relevant-conduct analysis.

The defendant also argues that he should not be held accountable for the entire amount because he was either in Africa or incarcerated for a period of time during the conspiracy. He is

---

[1] The record includes evidence that the Third World Mob dealt 223 kilograms, or so, of marijuana from about August 2013, until November 2022. That would yield an approximately relevant conduct amount of 24,753 kilograms, which would still score as a BOL of 34.

3

wrong. The question is, was the amount reasonably foreseeable to him based on his, and his coconspirators conduct. The answer is yes. Testimony at the trial of the coconspirators more than established this fact, as seen by the verdict for both Abate, who was not incarcerated during most of the conspiracy, and Savage, who was incarcerated during the conspiracy. Malik Curry testified he got one to ten pounds of marijuana from Teddy Asefa and did so "[s]ometimes weekly" and "[s]ometimes monthly." (Doc. #: 273 at 2509.) To be clear: He got those amounts of marijuana from Teddy Asefa from 2015 to 2021.

The defendant further counters by contending that he bargained for a BOL of 30. That is not true. If the parties would have bargained for a BOL of 30, that would have been included in the plea agreement.

The PSR properly calculated a BOL of 34. The objection should be overruled.

### 2. Objection to the dangerous-weapon enhancement under U.S.S.G. § 2D1.1(b)(1)

Asefa next objects to the dangerous-weapon enhancement under 2D1.1(b)(1). That enhancement applies if a "dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). The enhancement applies for any weapon "unless it is clearly improbable that the weapon was connected with the offense." 2D1.1(b)(1) n.11(A). Here, any one of a number of firearms at issue can be attributed to Asefa. The evidence at trial established that the Third World Mob, under Asefa and Abate's leadership, held stash houses for drugs and guns.

First, there were firearms found at Royal Crescent. Royal Crescent was a Third World Mob stash house. Asefa was seen on surveillance at Royal Crescent at least one other time prior to the day it was searched, and guns and marijuana were recovered. Asefa left there shortly before the discovery. The firearms found in Royal Crescent were related to the conspiracy—individuals like Asefa, Abate, and Savage, for example, were prior convicted felons and not allowed to possess firearms; the reason drug dealers have guns near their drugs and money is to protect their drugs

4

and money. On these facts, Asefa cannot credibly say it was clearly improbable that the weapon was connected to the offense.

Asefa was arrested on November 1, 2022, in a stash house with more than 1,500 pounds of marijuana, packaging material, and three firearms. There were three people found in the house, all leaders of the Third World Mob—Abate, Asefa, and Solomon. These guns were clearly related to the drug trafficking: all three men are drug traffickers, they are high ranking members of their DTO who carried guns on them during their drug activities, Chapel Stone was a stash house, they were there to unload more than 1,500 pounds of marijuana worth more than $3,000,000. In short, the three people at that house that day each carried in one of the three guns that were found that day at the location near all of the drugs. This evidence was good enough for Abate to be convicted of a 924(c). It's good enough for Asefa to be assessed a gun at a lower standard.

Asefa rightly points out that presence alone in the house where there's a firearm *might* not be enough to convict at trial. *See, e.g.*, *United States v. Beverly*, 750 F.2d 34, 36–37 (6th Cir. 1984). But that's not what we have here. First, that is case for the *conviction* under a beyond-a-reasonable-doubt standard—not at sentencing under a preponderance standard. Second, we do not just have presence. The Sixth Circuit has explained that presence *plus* "other incriminating evidence . . . serve[s] to tip the scale in favor of sufficiency." *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007). Stated another way: "[o]ther incriminating evidence must supplement the defendant's proximity to a firearm in order to tip the scale in favor of constructive possession." *Id.* That is exactly what we have here. The government also "presented substantial evidence that Defendant was engaged in narcotics trafficking, which is evidence of a motive to possess a firearm." *United States v. McCreary*, No. 09-CR-20191, 2010 WL 1052436, at *11 (E.D. Mich. Mar. 19, 2010), *aff'd*, 489 F. App'x 87 (6th Cir. 2012). Relevant here, "[c]ourts have held that

5

evidence of drug dealing is admissible to show a motive to possess firearms illegally." *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005).

Three members of the DTO were present, three firearms were located, Asefa and Abate are prohibited from possessing firearms, and they were found with over 1,500 pounds of illegal narcotics. The enhancement was properly applied, and the objection should be overruled.

### 3. Objection to premises enhancement under U.S.S.G. § 2D1.1(b)(12)

Asefa objects to the 2-level enhancement for maintaining a premises. The PSR properly assessed the enhancement for the reasons stated in the PSR. The investigation revealed and the evidence confirmed that multiple residences were used by the DTO to facilitate drug trafficking. The residences were used to store drugs, drug trafficking paraphernalia, firearms, and U.S. currency and to sell narcotics.

The defendant seems to point to the fact that he didn't own or rent any of these locations. That's not how the DTO worked and that is not a requirement. One of the apartments was fraudulently rented by one of Asefa's girlfriends. Teddy Asefa was a high-ranking member of a violent DTO that kept houses to store drugs and guns related to drug trafficking. He and his high-ranking co-defendants controlled every aspect of the DTO, including who rented the stash houses, and who came and went to and from the stash houses. The premises enhancement was properly applied.

### 4. Objection to leadership enhancement U.S.S.G. § 3B1.1(a)

The enhancement was properly applied. Asefa tries to resist the above reality with several points. He first contends that it was his recollection that the Government would not pursue a leadership role. The Government has no such recollection. It is the Government's practice to make such representations and agreements in the body of the plea agreement, which, here, contains no such agreement.

He next points to various factors that, to his mind, support his contention that he's not a leader. As outline in our response to our letter attached to the PSR, they do not.

He also claims that based on the dates of the deaths, his trip to Africa and the indictment, that it is improbable that he could have assumed a leadership role in 3WM. He correctly states the that the deaths occurred in 2021, and he was in Africa until April of 2022. He claims that the alleged end date of the conspiracy is April 2022. That is not true. As the indictment clearly states: "Beginning in or around 2013….and continuing up to and including the date of this Second Superseding Indictment." The Second Superseding Indictment was returned on December 6, 2023. Asefa along with Abate and Solomon were arrested in Chapel Stone on November 1, 2022, with over 700 kilograms of marijuana and guns. A low-level guy is not going to be around over approximately $3,000,000 in narcotics. Furthermore, two days after his arrest law enforcement officers seized approximately $55,000 in U.S. currency—drug money—that he had his then girlfriend remove from a hiding place in his apartment and give to his brother.

The enhancement was properly applied.

## 5. Objection to the threats-of-violence enhancement under U.S.S.G. § 2D1.1(b)(2)

Asefa next objects to the threats-of-violence enhancement under U.S.S.G. § 2D1.1(b)(2). That enhancement applies, by its own language, "if the defendant used violence, made credible threats to use violence, or directed the use of violence." The PSR properly walks through why this enhancement applies. In brief, Teddy was part of the team that fronted Brandon Moore a large amount of narcotics—worth more than $40,000. Brandon Moore didn't sell that marijuana and pay the 3WM back—it got confiscated. Teddy then went with Greedy to Brandon's house soon thereafter and told Brandon that he had no choice but to get back out there and start selling again. He argues the enhancement should not apply because Brandon testified that he felt relieved and thought his debt would be resolved after Greedy died and that no statements were

7

attributed to Teddy. Neither of these things matter. Teddy was with Greedy. And he was not ordered into the car—Brandon was. Brandon knew members of the 3WM were dangerous and carried guns. That's why Brandon felt threatened.

Again, this enhancement was properly applied.

### 6. Objection to committing this offense as a part of a pattern of criminal conduct under U.S.S.G. § 2D1.1(b)(16)(E)

This enhancement applies where the defendant receives an aggravating role adjustment, like Teddy rightfully earned here, and the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood, just like the facts show Teddy did here.

This enhancement was properly applied here. Teddy earned the leadership role, as he should have. As the PSR makes clear, the other factor under consideration is whether there is a pattern of criminal conduct engaged in as a livelihood. Application Note 2 to 4B1.3, which defines terms relevant to the analysis here, explains that "engaged in as a livelihood" means: (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceed 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that 12-month period.

Both are met here:

(A) The 3WM, of which Teddy was one of the principal leaders, dealt no less than 500 pounds of marijuana per month from 2015 through October of 2022. That's 94 months. The investigation demonstrated that the value of that marijuana was, charitably, $2,000 per pound. That's $94,000,000 of revenue during the course of the conspiracy. The defendant didn't get all of that. But he got plenty enough of it. This would explain how he never had a real job, but still had money to take lavish trips, drive whatever cars he wanted, take his lady friend out to eat wherever and whenever, and how one of his co-defendants could give

8

up a million dollars of cash in a suitcase without even being worried about it. The defendant made more money selling drugs during his long run as a drug dealer than most people will make in multiple lifetimes.

(B) The defendant had no other job but being a drug dealer during the conspiracy. He tries to counter by arguing that he was employed at his brother's bar during the conspiracy. He was subject to extensive surveillance during the investigation and was never once seen working a real job. This is also the same bar from which the defendant's prior girlfriend submitted fake pay stubs under a pseudonym to rent a stash house for the defendant's DTO.

### 7. Objections 7 through 19

These objections all relate to the Offense Conduct included in the PSR (paragraphs 30, 32 -40, 45, 46, 48. 50-53. 56 – 58). Some of them overlap with the other six objections that have been addressed. Asefa signed the statement of facts attached to the Plea Agreement that address most of these issues, and he acknowledged in his acceptance of responsibility that the statement of facts was an accurate representation of his conduct. He further acknowledged that he knew his coconspirators were engaged in criminal activity when he began his involvement with them. Now, he wants to object to the information contained in the PSR. Oddly enough, while objecting that the conduct concerning his brother was even criminal, he expresses remorse for getting him involved.

The information contained in these paragraphs is accurate and properly included.

### 8. Objection to the disaster-relief enhancement under U.S.S.G. § 2B1.1(b)(12)

Asefa argues that the enhancement includes the same elements as the underlying offense. Not every wire fraud case involves disaster relief money. The enhancement was properly applied.

For these reasons, the Court should overrule the defendant's objections.

9

## II. The Proper Sentence

Sentencing requires a determination of the applicable guideline range, whether a departure is appropriate, and a consideration of the factors in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). The 3553(a) factors favor a sentence at the top of the agreed upon range of the parties of 240 months.

### A. The defendant is a high-level drug dealer.

The defendant played a key role in selling large amounts of narcotics on behalf of a violent street gang. As the trial of his coconspirators and the PSR explained, the gang imported and dealt large quantities of marijuana. The searches and seizures detailed during that trial and listed in the PSR in part demonstrate the extent of the narcotics-trafficking operation:

- August 21, 2013, Tucson: This is where Asefa, KG Abate, and Fentahun Mengistu were arrested in a motel room with more than $80,000 in U.S. currency and 95 pounds of marijuana.

- August 9, 2019, Phlox Avenue: This is where Asefa's co-conspirator KG Abate lived with his girlfriend. Law enforcement found 12 cell phones, a money counter, a digital scale, and $940,740 in cash. (The street value for marijuana is about $2,000 per kilogram.)

- April 20, 2022, Stor All storage unit: This unit was rented by Thomas Asefa on behalf of Teddy Asefa. A search uncovered drug paraphernalia, packing materials, and identification and documents belonging to Teddy Asefa.

- August 4, 2021, Chambers Road: A search uncovered 3.13 kilograms of marijuana, scales, a firearm, and ammunition. A plane-ticket stub with coconspirator Savage's name on it was found at the apartment.

- November 9, 2021, Royal Crescent: This residence was associated with KG Abate and Teddy Asefa. In a search of the residence, law enforcement found 45.2 pounds of marijuana, three handguns, nine magazines, and ammunition. Asefa was there shortly before the search.

- January 6, 2022, Taliesin Place: Representatives of the apartment made entry and saw a large amount of marijuana, drug-trafficking paraphernalia, and a large number of handguns. Before law enforcement could search the residence, Asefa coconspirator Menelik Solomon broke in and took most of the guns and drugs.

- November 1, 2022, Chapel Stone: Law enforcement seized more than 1,500 pounds of marijuana, multiple firearms, 9 cell phones, and several thousand dollars. Teddy Asefa, KG Abate, and Menelik Solomon were present.

These were not seizures in isolation. The defendant and his gang, the Third World Mob, were subject to a years-long investigation by federal law enforcement. In addition to the searches, they were subject to extensive surveillance. None of them had jobs besides drug dealing. They were importing significant quantities of narcotics from out of state and making a lot of money doing so.

For his part, the defendant was in the upper control group of the conspiracy. As the trial demonstrated, there were many, many members of the 3WM. And there were many dealers who were supplied by the 3WM. But there were only a few who were often present at the stash houses, and who were part of the leadership group at the top, and who were regularly assisting with the high-level operations of the 3WM: Amanial Andemariam ("Greedy"), Abubakarr Savage, KG Abate, Menelik Solomon, and the defendant, Teddy Asefa. As the trial established, these men were trafficking thousands of kilograms of narcotics per month, were doing so for years, and were making large amounts of money. Death and violence followed them. They were not the types—particularly at the top—to associate themselves with anyone they thought was inconsequential. They were serious, serious players, and anyone with them regularly was—and is—a serious player. That is Teddy Asefa.

The evidence at trial backs this up. After the drugs Brandon Moore got from Greedy were seized in the traffic stop, Asefa was one of the people that went to his home and had him ride around with them while telling Brandon he was not finished selling for them. Asefa was seen leaving Royal Crescent with Savage in November of 2021; Savage was wearing a ski mask. The next day, Royal Crescent was searched, and 20 kilograms of narcotics were found inside the same apartment. The drugs were packaged in the same way as drugs found at other searches implicating the Third World Mob's drug dealing. After his arrest, Asefa is on jail calls directing his girlfriend to find something in the kitchen cabinet—which turned out to be approximately $70,000 U.S.

11

currency. She was to use some for a lawyer, put some on his books and give the rest to his brother Thomas. He also spoke to Thomas and had him pick up the money from the apartment. She also testified that she often saw Teddy with a firearm in the apartment along with cash and drugs.

Long story short: Teddy Asefa is a high-level drug dealer, and he should be sentenced accordingly. This supports the government's request for a sentence of 240 months.

**B. The defendant was part of the Third World Mob, which is a violent, dangerous street gang.**

This is no ordinary marijuana case. The Third World Mob was about more than just selling marijuana. As the PSR lays out, the gang had a violent streak. They intimidated perceived rivals. They were involved in beefs with other drug dealers.

Worse yet, death followed them. Paragraphs 32 through 38 lay out multiple deaths with a nexus to the Third World Mob. One person who was killed was thought to owe them money. Another—Yiarid Tesfai—was a Third World Mob member murdered at a house on Reeb Avenue. Several people thought to be at the house the night of the Tesfai murder were themselves murdered within a few months. Another Third World compatriot—Fentahun Mengistu—was murdered in a drug deal gone bad in front of a Third World Mob stash house on 12th Avenue.

Finally, Asefa's criminal history further bolsters the reality that he is a dangerous drug dealer. His first contact with the courts was as a juvenile that committed an armed robbery in November of 2024. During the robbery he shot the victim in the abdomen and stole his jewelry, wallet and car. At the age of sixteen, he was bound over to be prosecuted as an adult. He was sent to prison but later granted judicial release. During that period of supervision, he had numerous violations eventually leading to him being revoked and sent back to prison. The rest of his convictions are either gun or drug related. He has a history of serious disciplinary infractions while incarcerated (which confirm that he is dangerous).

The government is approaching the sentencing of Teddy Asefa like the safety of the community is on the line. The drug seizures, the firearms seizures, the deaths, the money seizures, the searches, the investigation, and the trial in this case all confirm how serious this all is. And they confirm that the defendant is a true danger to the community.

### C. The defendant fraudulently obtained PUA money

Teddy received at least $16,614 in PUA funding. On his application he claimed to be in customer service. During the extensive surveillance done during the investigation, he was never observed going to a customer service job. His girlfriend confirmed that he was not a customer service rep but a drug dealer and dog breeder. His tax records—or lack thereof—also confirm his lack of legitimate employment. Notably, he did not report to the PSR writer that he ever had a customer service job that was interrupted due to the COVID pandemic.

### III. Conclusion

For the reasons stated, the United States recommends a sentence of 240 months, followed by five years of supervised release. The government submits that this sentence is sufficient but not greater than necessary to satisfy the statutory purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

KELLY A. NORRIS
Acting United States Attorney

*s/Elizabeth A. Geraghty*
ELIZABETH A. GERAGHTY (0072275)
S. COURTER SHIMEALL (0090514)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
O: (614) 469-5715 / F: (614) 469-5653

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *Government's Sentencing Memorandum* was electronically served via the Court's CM/ECF system this 2nd day of September 2025, upon counsel of record for defendant.

>*s/Elizabeth A. Geraghty*
>ELIZABETH A. GERAGHTY (0072275)
>Assistant United States Attorney